## Petition for Abandonment of Martin's Mill Bridge

*George S. Black*, for petitioners.
*Rudolf M. Wertime*, for protestant.

DEPUY, P. J., June 3, 1959.—This matter is before the court upon petition filed July 18, 1958, by the three members of the Board of Commissioners of Franklin County. The court ordered a hearing in the courtroom on September 3, 1958, and caused advertisement thereof to occur once a week for three successive weeks by newspaper and handbills. On that date and on October 9 and October 28, 1958, hearings were held and 169 pages of typewritten testimony were taken. Preceding the hearing of October 9th, the court and counsel, with the parties, visited the Martin's Mill Bridge and examined the same, with the commissioners' bridge engineer, Mr. Frederick A. Nassaux, and with Mr. David Coble, an engineering witness for Olin Hess, protestant.*

The petition of the commissioners averred their duty of maintaining county bridges, including the one here in suit which crosses the east branch of the Conococheague Creek in Antrim Township, Franklin County, and is known as Martin's Mill Bridge or as Shindle's Bridge. The petition alleged the bridge to be in a state of dilapidation and disrepair, that its condition was such as no longer to be safe for use of the public, that the bridge was no longer necessary for the accommodation of public travel and that the maintenance of the bridge had become burdensome to the County of Franklin. The prayer was that the court, under section 2634 of the County Code of August 9, 1955, P. L. 323, approve the destruction, vacation, abandonment and removal of the bridge.

---

* "The bridge is a covered timber bridge of continuous span, 12 or 13 feet wide and 205 feet long, being one of the longest covered bridges in the state."

No other pleading was filed. Residents of the bridge area had submitted to the county commissioners on July 8, 1958, a petition having 142 signatures asking that the decision to close the bridge be reversed.

At the hearings the board of commissioners were represented by their solicitor, George S. Black, Esq., and Olin Hess, who resides near the western terminus of Martin's Mill Bridge, appeared as protestant and was represented in the proceedings by Rudolf M. Wertime, Esq., as his attorney. . . .

### Opinion and Order

In the argument of counsel the following questions were raised:

1. After the county commissioners have placed on record a resolution to abandon a county bridge because it has become burdensome and is not necessary for public travel, and have petitioned the court for approval of such abandonment, what is the scope of review by this court?

2. In fact, is Martin's Mill Bridge (a) burdensome to the county and (b) unnecessary for the accommodation of public travel?

The law governing the present proceeding is set forth in The County Code of August 9, 1955, P. L. 323, 16 PS §2634, as follows:

"Whenever it appears to the county commissioners that any county bridge including but not limited to any destroyed or partially destroyed bridge has, from any cause, become burdensome and is no longer necessary for the accommodation of public travel, they may upon approval of the court of quarter sessions close, vacate, abandon and remove such bridge."

The language of this section is in substantial accord with that of the earlier statute of May 2, 1929, P. L. 1278, art. 9, sec. 734, and the Act of June 1, 1915, P. L. 711, sec. 1, with the exception that the former statutes required, before a road could be closed, that the grand

jury *and* the court of quarter sessions approve. The present law makes no mention of the grand jury.

The circumstances which would justify the county commissioners in undertaking to close a bridge are not enumerated by the statute. The language of the Act of 1915 envisaged a causal situation, ". . . the erection or opening of other bridges in the vicinity thereof or from any other cause," which the statute no longer sets forth. .Evidently the legislature considered the present language of the statute "from any cause" broad enough to cover *any* reason which in the view of the commissioners makes the maintenance of the bridge "burdensome" and "no longer necessary for the accommodation of public travel."

On the first question above, as to the scope of our review, counsel have not pointed us to any precedent, nor have we found any. It is our view that after a board of commissioners has found that a bridge is burdensome and is no longer necessary for the accommodation of public travel, their determination does not rise to the dignity of those administrative decisions which, when appealed to a court, possess an elevated status, which the court will not upset if there can be found in the record a modicum of credible evidence to sustain them. The board of commissioners is *not* a judicial body. As an administrative body the board has not been required by law, when acting to close the bridge, to meet the essentials of notice and hearing where both sides might fully present their evidence and argument.

The essentials of such a determination, exhibiting the elements of due process, are illustrated in Pennsylvania State Athletic Commission v. Bratton, 177 Pa. Superior Ct. 598, 604 (1955), as follows:

"We think it may be said also 'that adjudicatory action cannot be validly taken by any tribunal, whether judicial or administrative, except upon a hearing

wherein each party shall have opportunity to know of the claims of his opponent, to hear the evidence introduced against him, to cross-examine witnesses, to introduce evidence in his own behalf, and to make argument.' "

In Highland Township Petition, 9 D. & C. 2d 339 (1956) (Adams County), President Judge Sheely considered a problem of the same general type as the present one. The Highland case arose, however, under The Second Class Township Law of May 1, 1933, P. L. 103, as amended, 53 PS §66115. Judge Sheely arrived at a conclusion as to scope of review which is perhaps the opposite of ours here. There petitioners were the road supervisors of the township. They sought approval of the court for relocation of a section of road and vacation of the old section. The court held that the petition could raise only legal questions, as in the case of exceptions filed to a report of viewers, and that *advisability* of the improvement would rest solely with the supervisors. He held the legislature did not intend for the court to substitute its judgment for that of the supervisors.

In our view the legislature, in the bridge statute quoted, by employing the phrase "upon approval of the court . . ." established a review de novo by the court of quarter sessions on the entire question. We proceed to such a review.

Protestant has argued that at the hearing the commissioners did not make out a prima facie case under the statute. We denied protestant's motion to dismiss at the conclusion of petitioners' evidence. Our view now remains the same as it was then, that the evidence for petitioners sufficiently negatived necessity for public travel in relation to substantial cost and established a prima facie case of "burdensomeness' and "lack of public necessity." Apart from oral testimony as to very moderate public use, the physical facts

of the area, involving Martin's Mill Bridge, Binkley's Bridge, the road network and the distribution of population, tended strongly to support the position advanced by petitioners. At the present stage of adjudication, we are, of course, beyond the issue of prima facies and at the point of decision on the whole record.

A careful examination of the statutory terminology, namely, the words "burdensome" and "necessary for the accommodation of public travel," indicates to us that these ideas inescapably overlap and are not separable. We consider that an affirmative finding of this court as to either of the two conditions would not dispose of the question. To meet the criterion established by the statute it is necessary, as we see it, to posit an equation involving the following factors:

A. The degree of *public* use of the bridge;

B. The degree of *necessity* for public use;

C. The weight carrying capacity and width required of the bridge to permit the optimum public use;

D. The cost in capital outlay and in upkeep expenditure required to maintain a bridge of the necessary load carrying capacity and width;

E. The present cash and debt position of the county;

F. The present tax burden upon the people and what increase could reasonably be imposed;

G. The normal fiscal demands upon the county commissioners under the current budget, and the expectable or contingent liabilities of the immediate future and the extent thereof;

H. The proximity and convenience of other bridge crossings accommodating the same residential area and the public travel;

I. The estimated cost of replacing the existing bridge to accommodate maximum present-day permissible loads:

J. The estimated cost of repairing the present bridge in order to accommodate a lesser weight than the maximum, and in this case 10 tons.

The court may, by applying the applicable facts to this formula, find that certain of the factors are strongly present, and others slightly present. By carefully evaluating the relationship of the factors and the weight of the evidence as to each, the court may be persuaded to one conclusion or the other, for or against the closing of the bridge.

For example, if the public use of the bridge is modest, and the cost of effective repair is modest, there would seem to be no reason for closing the bridge. Likewise, if the public use of the bridge is modest, apart from use by a few families residing along the bridge road, and the cost of repairing the bridge is heavy, preservation of the bridge would probably not be justified, since there are equal or superior facilities nearby.

As we see it, the question of "burdensomeness" relates entirely to a solving of the equation between public necessity, cost and the financial position of the county. If county moneys are in fair supply, if the cost of repair is modest and if there is a moderate degree of public necessity, the bridge ought, probably, to be preserved. On the other hand if the county is in bad financial situation, if substantial additional expenditures are foreseen as inevitable, if the cost of repair is more than routine and the necessity for public use is slight, probably the bridge ought to be closed.

Looking at the actual conditions presented by the evidence, the county appears to be in a condition of moderate financial stability, with a capacity for increasing the tax burden if this were necessary, but on the other hand there is reason to think that in the era ahead it will be necessary for the commissioners to repair or replace a good many bridges on which there has not been much work done in recent decades.

Many of these bridges are unfitted in characteristics for the present motor age and for the weight of the vehicles passing over them. The school bus problem is of increasing proportions, the buses are getting larger, and the public authorities more demanding as to the condition of bridges on school routes.

It does not appear that the Martin's Mill Bridge, if closed, would inconvenience other than a small group of people living close to the bridge on Route 341 and nearby. Most people living on any of the other highways in the area except 341 have as convenient or a more convenient route to the principal towns, such as Upton, Mercersburg, Greencastle, Coseytown and Hagerstown, or Williamsport, Md., than by passing over Martin's Mill Bridge via this short, steep and unimproved highway, Route 341. Downstream a mile and a half from the wooden bridge there is Binkley's Bridge, on Route 28034, a modern two-lane bridge, concrete and steel, fully capable of carrying any traffic diverted from Martin's Mill Bridge and with only a few minutes additional time or slight additional mileage expense resulting. In the days of the horse and wagon, when Martin's Mill Bridge was constructed, an additional circuit of this kind would, of course, have consumed materially more time than in the motor age.

There was argument made too on behalf of the bridge as a historical relic. Having long been devoted to the cause of history, general and local, we are mindful of the reasonable demands of antiquity upon new generations in any country. Alas, the historical interest in the present bridge is a tardy one, for the bridge has gravely deteriorated. Had timely repair and precaution as to weight of traffic been evidenced at an earlier era, with better attention to accumulation of surface water at the east approach, the bridge today may have justified, from a financial viewpoint, a

reasonable concern for posterity. At any rate, the law here allows no concern for historical demands.

From the evidence it is clear that Martin's Mill Bridge today is in a seriously dilapidated, rotten and broken condition and is wholly unfit for vehicular traffic. Its closing, in June 1958, was urgently necessary, either under the normal volume of traffic, or under the notably increased volume occurring by reason of reconstruction of Route 16, and the fact that Kuhn's Bridge was closed.

Considering its long history, picturesqueness and usefulness to the local people, if the Martin's Mill Bridge could be reopened for a really modest sum of money, perhaps it ought to be reopened. But $21,000 in our view is not a modest sum of money for reëstablishing this bridge for the modicum of travel which was using it.

Rather obviously there is not sufficient public use to warrant building a new bridge here at a cost of $60,000. Protestant, Mr. Olin Hess, undertook to show that to amortize during a 20-year span the cost of major repairs at $21,000 only $.10 per car crossing would be required. The fact is that these same cars can easily use other road facilities at *no expense* to the county, saving the sum of $21,000 in county moneys for use at a more essential point, one where the justice of such an expenditure would be more persuasive to the vast group of county taxpayers. It can safely be said from the evidence that the public *use* was quite modest, and that the *necessity* of preserving the bridge for public travel was and is nil.

Because of the steep declivity, where the road approaches the bridge from the east, vast quantities of water in rainy and snowy seasons have undoubtedly flowed on to the bridge at the stone abutment, gradually rotting away the timbers. When repairs were made they appear not to have been based upon ideas

of engineering or permanency, for example, the six by six inch wooden prop supports under the bridge near the east abutment and the channel irons along the west bottom chord, underneath. The latter are not continuous and are not especially effective for the task for which they were applied. Anyone who will take the trouble to go under the bridge and examine its condition will obtain a new view of the gravity of the situation and perhaps will wonder how the bridge could be put in good condition for only $21,000.

It is true that considerable hardship to Mr. Olin Hess, whose residence is near the west end of the bridge, would result from closing of the latter, a small part of his farm being situated on the east side of the creek. But this fact does not make the bridge *necessary* for the accommodation of *public* travel, employing the words of statute. It is hardly arguable that the public taxpayer should maintain a bridge here for the benefit of a single property holder, or for the several additional families residing on this 2.8 mile section of road, Route 341.

Some 30 witnesses testified against the closing of the bridge, undertaking to negative the element of burdensomeness to the county and to show necessity of the bridge for *public* travel. These witnesses fell into several categories, the large group who have business relations with Mr. Hess, some relatives of his, several antiquarians, some persons interested in sport and recreation along the stream and several for other reasons. The testimony of all witnesses in any legal proceeding must be viewed in the light of interest, though testimony of an interested witness is not by that mere fact rendered unbelievable.

The tenor of the testimony by protestant's witnesses can be illustrated as follows: George Myers, who operates a portable feed grinder, knows of the bridge for 23 years, has used it two or three times a week, plus

recreational use and considers it necessary for public travel, though in fact he can use the Binkley Bridge for his purposes; Edward Campbell, game protector, who gets in the bridge area frequently during the fall game season, observes the bridge and road used for recreation and for dumping trash, finds the bridge *convenient* at times and sees quite a few cars cross there on Sundays; Leonard Knauff, who buys livestock, uses the bridge two or three times a week, aside from recreation purposes and considers it necessary for public travel; Dr. B. Franklin Royer, retired, knows of the bridge for possibly 10 years and uses it three or four times a year; Lester Shindle farms near the bridge, uses it three or four times a week for visits to relatives or else to the store, or for borrowing Mr. Hess' machinery, and observes a recreational use by others, mostly on Sundays; Bruce Shindle, uses the bridge about once a day for visiting relatives and would find it convenient if the bridge remains open; Reginald Miller, trucker, uses the bridge five or six times a week and considers it essential for public use; Howard Gingrich, insurance man, uses the bridge 15 times a year and considers it convenient for public travel. The evidence shows that each witness used the bridge from once a day on an average to once a week, or once a month.

The fact that during a former era a bridge has been built at a certain place is not a guarantee that conditions will forever require the preservation of that bridge. With the building of other and more elaborate bridges, at the greatly increased capacity necessary for modern traffic, the level of cost to the county of modern construction under State standards and the cost of maintenance may make necessary the closing of an occasional bridge because of changed conditions. It is hardly practicable for the public through tax resources to maintain two bridges within a distance of

one and one-half miles on the same stream in a sparsely settled area such as here involved. If changed conditions in the future should render such a bridge necessary a new one can be built then at no greater relative cost than at present and there will be certainty of need before it will be built. In such event the construction would, no doubt, be such as to care for the maximum legal traffic on the highways.

As for the proffered plan of major repair at $21,000, we have reservations arising from the fact that even upon completion of such a project, assuming that no more than this sum would be found necessary, the end product would still be of limited use for traffic. With the posited 10-ton limitation, there are certainly no facilities here, particularly at the east end of the bridge, for the operator of a heavy lumber truck or fuel truck, after learning that it is overweight for the bridge, to reverse his course. It is true that weight limits can also be posted at intersections some distance away from the bridge. In any event, it is dangerous for any vehicle to maneuver near the east entrance in light of the sharp and curving downhill grade as one approaches the bridge along Route 341, and the absence of any space for turning around.

At the beginning of our discussion we enumerated 10 factors in an equation which should solve the case. Taking into consideration all the factors, including the minor public travel, the lack of public necessity in light of the nearby bridge downstream, the substantial cost, $21,000, of major repair, the fact that the bridge would still carry a limitation of weight, the fact that the county faces sharply increased bridge expenditures during the coming year, it is our view that, under the circumstances shown, preservation of this bridge is burdensome to the county and that the bridge is not necessary for the accommodation of public travel. Accordingly we must grant the prayer of the petition.

Now, June 3, 1959, the prayer of the petition of the Board of Commissioners of Franklin County filed July 18, 1958, is granted and this court approves the closing, vacation, abandonment and removal of the Martin's Mill Bridge for the reason that the same has become burdensome and is no longer necessary for the accommodation of public travel. Costs of this proceeding shall be paid by the County of Franklin. Exception granted to protestant, Olin Hess.